Morgan, J.,
dissenting. The uncontradicted statement of Mr. Far *516 rar, one of the counsel for the appellees in the brief, is that the record was filed on Saturday; that he sought to examine it on Monday, when he found it had been taken out of the clerk’s office, and that it was not returned until more than three judicial days after the return day.
The custom of allowing counsel to take the records of cases pending an appeal from the clerk’s office is, in my opinion, a vicious one; but as it has been tolerated by the court, I do not think that it should prejudice a party’s rights. The appellee can not discover what irregularities there are in a transcript unless he has access to the transcript. The ruling of the court, in my opinion, so long as this practice continues to be tolerated, gives to every appellant the power to prevent his appeal being dismissed. He controls the record until the day upon which he is forced by law to file it. He then files it. Under the implied consent of the court, he removes it immediately. He does not return it until three judicial days have elapsed. It may be filled with irregularities and illegalities, and yet the appellee’s motion to have it dismissed will not be listened to because he speaks too late.
It seems to me that the court which, by its tolerance, permits an appellee to be placed in such a position, should turn a deaf ear to the appellant, under such a state of facts, when he says that the motion to dismiss was not made in time.
I do not propose to cavil at the ruling of the majority upon the second and third grounds, which they assign for refusing to dismiss the appeal. The questions involved are, in my opinion, too serious to allow, their being shuffled off upon mere technicalities. I prefer to take them as I find them, and to express my opinion upon them as I think they should be decided upon the principles of law and right.
And for the same reason I pass over the question as to the misjoinder of parties; the exceptions filed by the defendants, the question of their having been waived by their answers, and the right claimed by them to challenge ten jurors each.
It is to be observed that the defendants do not pretend that the election was conducted in strict compliance with the requirements of the law. They deny, it is true, the allegations in the petition, but they only aver that the election was “substantially legal and fair in every respect.”
In my opinion it was illegal and foul from the beginning to the end. The law provides that it shall be the duty of the commissioners of election to receive the ballots of all legal voters who shall offer to vote, and deposit the same in the ballot box to be provided for that purpose; the commissioners are to deposit the ballot of each voter in the ballot box in full view of the voter- himself. Acts 1873, section 9 p. 17. In all cases the vote of the person offering to vote is to be *517 taken from the hand of the voter by one of the commissioners of election ; section 10. The votes are to be counted by the commissioners at each voting place immediately after closing the election, and without moving the boxes from the place where the votes were received, and the counting must be done in the presence of any bystander or citizen who may be present. These provisions of the law are not only directory, they are peremptory, and they were enacted, I think, in. order that the people should be assured of a fair ballot, a fair count* and an honest return.
Now what are the facts 9 In so far as poll No. I at least is con" cerned, the commissioners of election occupied a room the window of which was more than six feet from the ground. It was through this window that the ballots were handed to the commissioners. The window itself was barricaded with slats, running up and down, some three inches apart. A very large number of the ballots were handed to the commissioners, attached by the voters to a long pole; no voter who was on the outside of the room could deposit his own ballot in the box provided for that purpose, or see that it was deposited there; instances occurred where voters, when they handed up their ballots, called out for “greenbacks” in return, and got them; the greenbacks replacing the ballot on the end of the pole. A majority of the court seems to consider that this portion of the testimony is absurd and incredible, and that it is contradicted by nearly every witness who testified in regard to what occurred at that precinct; I have examined the testimony of every witness whose evidence is in the record, and I do not find it contradicted. If denied at all, it is a negative denial, that is, the witness did not see it. Certainly, witnesses testify that everything was regular; that the election was a fair one, and that every thing was conducted properly. But the position of the ballot box, the manner of voting, etc., is testified to by every witness, and when men tell me that every thing was fair, and in. the same breath say that two opposing cadidates each voted several times, under the pretense that they were voting other persons’ ballots, and that one did it because the other did, I put no faith in their notions of fairness. And when commissioners of elections, under whose eyes such proceedings were carried on, tell me that there were no irregularities at their polls, I am forced to say that I do not believe them. A majority of the court seems to think that these were mere irregularities resulting from a want of information on the part of the officers of the election. In my opinion they are criminalities for which they should be punished, and which renders their acts void.
When the polls closed the votes were not counted according to law. The ballot boxes in which the ballots were placed, were given to the *518 clerk of the court, their proper custodian. On the trial, plaintiffs obtained a subpena duces tecum upon the clerk ordering him to produce them. He answered that they were not in his possession; that he had given them to R. R. Anderson, a special deputy appointed by him for that purpose. A subpena then issued to Anderson, the return upon which was that he could not be found. When this return was made, plaintiffs moved for a continuance. Thereupon the defendants admitted “ that the returns made out for the last election in this parish were not made out and sworn to as the law requires, and the ballots in the boxes from ward No. 1 will'not show the same results as the returns.” Plaintiffs rested their case. Defendants thep attempted to prove the result of the election by parol, and in order to lay a foundation therefor examined David Jackson, who swore that he had made diligent search for the boxes and returns, but had not succeeded in finding them ; that he had looked in the only place where he had any idea they could have been placed; that he had inquired of different parties whether they knew any thing about where the ballot boxes and returns were, and that he had done every thing since the commencement of the trial to get the boxes and returns. Now Jackson was the clerk of the court, and was by law the custodian of these ballot boxes and returns. He had himself given them to Anderson. On his cross-examination he says he supposes they were in Anderson’s possession, and that he had not asked Anderson for them since the commencement of the suit. Thus it appears that he asked every one about them except the only man in whose keeping they had been put. The possession by Anderson of these boxes was the possession of Jackson, and I think it was trifling with the court to say that he could not produce them or cause them to be produced. There was a process by which the defendants, after his testimony was given, could have forced the production of these boxes. They did not see fit to avail themselves of it, and they were not, I think, entitled to resort to secondary evidence. Indeed, what object would they have in producing boxes which, according to their own admissions, would show that the returns were not properly made. And what becomes of their assertion that the election was a fair one in the face of their admission that the ballots in the boxes of ward No. 1 would not show the same results as the returns.
In my opinion these admissions destroy the defendants’ case. How is the result of any election to be known except by the returns of the proper officers appointed for that purpose ? And who can say that a fair election has been held when it is admitted that the ballots cast would not show the same result as the returns'? I am not here contending that every irregularity in the conduct of an election will nullify *519 the election, or that a police law with regard to the manner in which an election is to be held, if unconstitutional, vitiates the election, which was the question before the court in Saucier’s case. 13 An. 301. Nor do I contest the principle laid down in Cooley and cited by the Chief Justice in his opinion, that election statutes are to be tested like other statutes, but with a leaning to liberality, in view of the great public purposes which they accomplish, but I do say that where the law specifically provides that an election shall be held in a particular manner and not otherwise, as, in my opinion, the election laws of this State do, it must be held in accordance with the law, and that if the ballots have not been kept as required by law, and surrounded by such securities as the law has prescribed with a view to their safe preservation as the best evidence of the election, it is impossible to determine who of the candidates before the people were legally elected. Here it is admitted that the requirements of the law were not complied with.
A jury, taken from the body of the people and selected according to law, themselves forming a portion of the voters of the parish, have declared that there was no legal election in the parish, and the testimony in the record satisfies me that their conclusion was a just and proper one.
I think the judgment of the district court, which sets aside the election, should be affirmed.
Wyly, J. I dissent in this case, and will file my reasons hereafter.
Rehearing refused.